A04A0114, A04A1718. KILGORE et al. v. SHEETZ (two cases).
(603 SE2d 24)

BARNES, Judge.

Michael A. Kilgore, P.C., and Michael A. Kilgore, individually, appeal adverse judgments on their claims for attorney fees. These cases involve the division of attorney fees between Kilgore and Lake Livingston Sheetz, the administrator of the estate of Whitner K. Livingston III. Attorneys Kilgore and Livingston worked together on litigation that settled after Livingston died; they did not have an agreement specifying how the fees from this litigation would be

divided between them. After that litigation concluded, the defendant in the earlier action interpled a portion of the attorney fees into court. At the end of a hearing on cross-motions for summary judgment in the interpleader action, the trial court reasoned that, in the absence of an agreement, the fees would be divided evenly between Kilgore and the estate, relying on *Nickerson v. Holloway*, 220 Ga. App. 553 (469 SE2d 209) (1996). This ruling was reduced to writing, and Kilgore appeals it in Case No. A04A0114, contending that the trial court erred in granting summary judgment to the estate and awarding him only 50 percent of the fees. He also argues that the trial court erred by awarding him only seven percent interest instead of eighteen percent. In Case No. A04A1718, Kilgore appeals the trial court's subsequent denial of his request for attorney fees under OCGA § 9-15-14. For the reasons that follow, we affirm.

Livingston signed three fee contracts in 1991 and 1992 with Jose Marquez and Leonard Borg, to represent them in several cases involving Mikart, Inc. and its principals. Earlier, Kilgore had introduced the clients to Livingston, because the firm where he was then employed was not interested in undertaking their representation.

The first action involved Mikart's unilateral cancellation of 72,000 shares of Marquez's stock and failing to pay dividends on his remaining 63,000 shares. Livingston's May 10, 1991 contract with Marquez provided that he would bill for his time at a reduced fee of $80 an hour against a $2,500 retainer, would be entitled to a 15 percent interest in any disputed stock shares that were recovered, and would not bill for any additional time until resolution of the issue. Marquez pledged 11,000 of his undisputed shares as security for these fees. This court affirmed the trial court's dismissal of Mikart's declaratory judgment action and its ruling that Marquez's complaint about the cancelled shares was barred by the running of the statute of limitation, but affirmed the trial court's denial of Mikart's motion for partial summary judgment as to Marquez's counterclaim seeking expenses of litigation. *Mikart, Inc. v. Marquez*, 211 Ga. App. 209 (438 SE2d 633) (1993).

On April 9, 1992, Livingston and Marquez entered into another fee contract. After reiterating the terms of the May 1991 contract, Livingston proposed to file a second action or amend the counterclaim in the first action to assert additional claims. In lieu of an hourly fee, Marquez granted Livingston a one-third interest in any damages received as a result of these additional claims.

Finally, on September 29, 1992, Livingston entered into a fee agreement with Marquez and Borg to prosecute a shareholders derivative class action against Mikart. In lieu of hourly fees, the parties agreed that Livingston would be entitled to all attorney fees awarded or negotiated in the direct and derivative actions. The

contract then provides, "Finally, you agree to grant me a one-third (1/3rd) interest in monetary and punitive damages which you obtain pursuant to the direct action against the directors and officers of Mikart."

Livingston hired Kilgore to work on these cases with him. Kilgore would handle the paperwork and Livingston would handle the court appearances. All of the pleadings in the cases were signed by Livingston, who was the only counsel of record.

After this court affirmed the trial court's dismissal of Mikart's declaratory judgment action, in June 1994 Mikart settled Livingston's clients' OCGA § 13-6-11 attorney fees claim for approximately $60,000, $40,000 of which was paid to Livingston for attorney fees. Kilgore and Livingston divided the fee evenly between them.

Livingston died intestate on May 15, 1995, at the age of 48. He was survived by his wife and his daughter from a previous marriage. On July 14, 1995, the Supreme Court of Georgia appointed Kilgore as a receiver of Livingston's files and records, to protect the interests of Livingston's clients. A substantial percentage of work on the Mikart cases was completed before Livingston died. On June 6, 1995, Kilgore wrote to Marquez and Borg regarding their need to find successor counsel to Livingston and recommended three attorneys. In his letter, Kilgore stated, "While I have practiced corporate law for 15 years, I am not [a] litigator and have never tried a case other than in small claims court. Moreover, I am not counsel of record in any of the above actions, and have advised both of you some days ago that successor counsel should be appointed."

Kilgore continued the letter by stating that Mikart's counsel had called him to say that the company intended to make a settlement offer in the pending cases. Kilgore offered to represent Marquez and Borg solely to negotiate a settlement if they wished, at a rate of $175 an hour for any time over five hours spent dealing with the settlement offer. Kilgore added,

> I also inform you that I have an expectation to receive a portion of the attorney's fees, on account of my substantial assistance to Mr. Livingston in the last four years, which the estate of Mr. Livingston ultimately receives by court award or negotiated settlement, or otherwise, in all of the above cases. While I do not believe that my expectation constitutes a conflict with either of your interests, I make this disclosure so that you may independently consider whether such fact warrants your employment of another attorney to deal with Mikart's settlement offer.

Both Marquez and Borg signed copies of the letter agreeing to Kilgore's terms.

Kilgore sent a separate letter to Marquez regarding his suit, in which Mikart was petitioning the Supreme Court of Georgia for a writ of certiorari regarding the trial court's award of $60,000 litigation expenses. Kilgore offered to represent Marquez in this appeal, and to collect the award after the appeal ended, for ten hours free and $175 an hour for any additional time spent. He also included language similar to the paragraph quoted above regarding his expectation of receiving a portion of fees the estate ultimately received from the attorney fee award Mikart was appealing. Marquez agreed to these terms.

Marquez settled his breach of fiduciary duty suit with Mikart on December 18, 1995, for $575,000, which included the $60,000 fee award that Mikart had sought to appeal. Kilgore retained $204,006 in attorney fees, or 15 percent of the total plus the hours he and Livingston spent prosecuting the case at $80 an hour, less Marquez's retainer and additional contributions. Marquez initially questioned that amount, but later agreed to it.

Mikart also settled the derivative suit, which the trial court certified as a class action on December 18, 1995, and approved the settlement on January 16, 1996. Mikart agreed to buy out the minority shareholders for a total of more than $8.5 million and agreed to pay "to the Estate of Whitner K. Livingston as former counsel for the class" a total of $300,000 in attorney fees, with a payment of $60,000 in cash and four additional payments of $60,000 plus six percent interest over four years. The agreement was signed by Mikart, its officers and attorneys, Marquez, Borg, Kilgore, and Livingston's widow as "executor/administrator," as well as an additional shareholder.

In 1998, Livingston's daughter petitioned the probate court to set aside a fraudulent will that his widow had probated. The probate court granted the petition, removed the widow as executrix of Livingston's estate, and substituted an attorney to act as administrator. Livingston's daughter ultimately succeeded that attorney as administrator of her father's estate, and is a party to this lawsuit in that capacity.

After a fee dispute arose between Kilgore and Livingston's administrator, Mikart interpled the final settlement payment of $64,200 into the court registry in December 1999, naming Kilgore, his professional corporation, and Livingston's estate as defendants. Kilgore cross-claimed against the estate for additional fees, and the trial court subsequently dismissed Mikart and realigned the parties with Kilgore as the plaintiff against the estate. A court-ordered accounting

established that Kilgore had received $225,285.48 in attorney fees from the estate, and that the estate owed him an additional $87,577.46. The parties consented to the disbursement from the court registry of $59,682.95 to Kilgore, which was the amount of the final promissory note principal and interest that Mikart initially interpled.

### Case No. A04A0114

As Livingston's administrator, Sheetz moved the court for summary judgment on the ground that, in the absence of a fee agreement, the attorney fees in these cases should be divided equally between Kilgore and the estate. Kilgore filed numerous motions for summary judgment on various issues and other motions, for a total of eight pending motions when the trial court ruled. The trial court granted Sheetz's motion in its entirety, and ordered the estate to pay Kilgore $31,367.03, which, added to the sums he already obtained, constitutes 50 percent of the total Mikart fees.

Kilgore asserts on appeal that the trial court erred in holding that, without an agreement, the appropriate fee split was 50-50 as a matter of law. He also asserts that the trial court erred in concluding that Kilgore presented no material issues of fact as to the existence of an agreement between Kilgore and Livingston, and in concluding that Kilgore was not entitled to interest at the commercial rate of 18 percent per year.

On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Preferred Real Estate Equities v. Housing Systems*, 248 Ga. App. 745 (548 SE2d 646) (2001).

1. Kilgore first argues that the trial court erred in holding that, without an agreement, our law requires an equal division of the fee. He contends that the court "failed to consider the effect of Livingston's death in terminating his attorney-client relationships and client agreements." Kilgore asserts that an attorney's death ends his client representation, and therefore a death occurring before a case settles ends the right of the deceased attorney's estate to share in any settlement proceeds.

Kilgore and Livingston had no written agreement regarding how they would divide the Mikart fees. When the trial court asked why not, Kilgore said, "Well, you've also heard [of] the old cobbler's children going barefoot. Frankly, sometimes attorneys don't take care of their affairs." The two lawyers had no oral agreement either, but rather a loose, ad hoc arrangement to share fees in some manner that

they both found equitable. As Kilgore testified, his "view of billing is probably one of the strangest that you've ever heard a lawyer talk about. And there's a lot of occasions in which I will engage in effort, and then at a later time I'll decide whether I'll send a bill or not." After Kilgore described in his deposition how the June 1994 $60,000 fee award was allocated among the two clients and two lawyers, opposing counsel asked, "[F]orgive me, but your testimony sounds as if the lawyers are working along in the case and whenever some money comes in, everybody would get together and decide who gets how much of it. Is that a fair or an unfair characterization?" Kilgore responded by describing a subsequent motion for fees that was on appeal when Livingston died.

Kilgore testified that, at a very early stage of the litigation, Livingston told him, "Of course, you know to the extent you help me I will make sure you get paid your hourly rate." Kilgore never sent Livingston a bill for his time, but "had an understanding that was reached early on within the litigation that to the extent that I assisted him with this litigation, I would be compensated on an hourly basis." Kilgore then stated that around September 1992, he and Livingston "had an understanding that the two of us would work together on this case and that the division of any monies that came out of that case would be divided by us on the basis of hours worked."

Later, when asked, "So if [Livingston] had been in life in 1995, there would not have been a 50/50 split of the contingent fee amount?" Kilgore answered, "I think that that was — I can't predict what would have happened if he was in life." The exchange continued,

Q. You said that was the basis on which you came to these terms [being paid a relative percentage according to relative effort]?
A. This is what I believed the two of us would have agreed to —
[Kilgore's counsel]: No, no, no.
A. — had he been in life.

Kilgore further testified at another deposition that "there was never any specific agreement concerning any particular percentage [of fee division] whether it be 80-20 or 20-80 or anything else because of the nature of how the representation in this case started." Kilgore was asked,

Q. Did you and Mr. Livingston ever discuss a time-based division of fees or was it just understood? What is the basis

after his death for saying this is the way the fees are to be distributed?

A. I think we both acknowledged that we were going into this — not that I was his employee or he was my supervisor but that we would work together and that the payment would be commiserate [sic] with the effort expanded [sic].

Q. Was that ever discussed explicitly?

A. I think we chatted about it informally from time to time, but it was never memorialized in writing.

Finally, in a later affidavit Kilgore stated that he and Livingston never had an agreement to share any fees 50-50, and that he believed that any agreement they had expired when Livingston died.

Rule 1.5 (e) of the Georgia Rules of Professional Conduct provides:

A division of a fee between lawyers who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; (2) the client is advised of the share that each lawyer is to receive and does not object to the participation of all the lawyers involved; and (3) the total fee is reasonable.

Few Georgia cases address the mechanics of fee-sharing between attorneys. In *Nickerson v. Holloway*, supra, 220 Ga. App. 553, we held that,

Georgia has historically followed the majority rule that " 'lawyers jointly undertaking to represent a client without a contract as to the division of fees share equally.' [Cit.]" *Glover v. Maddox*, 98 Ga. App. 548, 557 (1) (106 SE2d 288) (1958). Nickerson contends that this rule has been implicitly overruled by Directory Rule [1.5 (e) (1)] of the State Bar Rules, which provides that a lawyer should not divide a fee with another lawyer unless the division is made in proportion to the services performed and responsibility assumed by each.

But the purpose of this rule is to protect clients from the payment of referral fees which could unfairly inflate their bills by allowing attorneys to collect payment for little or no

work, and this purpose is not implicated where the attorneys dividing the fee have both done some work on the case and there is no suggestion that the client's fee is inflated or unreasonable. [Cit.] For this reason, we agree with those courts which have held that as long as both attorneys have done some work on the case beyond signing and referring the client, the courts will not engage in the cumbersome task of evaluating after the fact the relative contributions made by the bickering attorneys.

(Punctuation omitted.) Id. at 553-554. The proposition of law in *Nickerson* that attorneys without fee agreements must share the fees equally applies in this case.

Kilgore attempts to distinguish *Nickerson* by analogizing Livingston's death to disbarment. The *Nickerson* court held that the disbarment of an attorney *after* a case settles is irrelevant to the determination of how fees should be divided. Id. at 555. Kilgore argues from this that, if the attorney had been disbarred *before* the case settled, then the lawyers would not split the fee equally. The record is replete with instances in which Kilgore states his position that Livingston's interest in the settlement or contingency fees evaporated when he died, that Kilgore owed no duty, fiduciary or otherwise, to the estate to represent Livingston's interests in obtaining fees, that Livingston's client contracts were "null and void" upon his death, and that it was up to the estate to bring a claim against the clients for any fees to which Livingston was entitled.

Kilgore said that Marquez and Borg "understood that Livingston's death ended their legal obligation to him since he had fulfilled no contingencies . . . entitling him to payment for his services." Kilgore argued at the motions hearing that the death of an attorney ends all agreements with his clients. He also contends that he included Livingston's hours of work in the fee application he filed in the estate's name "as a gratuitous courtesy," "not because Borg, Marquez or I owed a legal duty to the estate, but because it was the moral action," "because of a donative intent to treat the estate fairly" and "because it was the decent thing to do."

The fee request and settlement documents were all made in the estate's name or signed by a representative of Livingston's estate. On the suggestion of an estate attorney and the request of Livingston's widow, Kilgore deposited all the funds, approximately $505,000, in Livingston's escrow account and then paid it out to Livingston's widow, expecting to receive what was due to him from her. He did this, he said, to ease the estate administration, using Livingston's escrow account because he did not have one of his own. Kilgore explained that he became a signatory on Livingston's escrow account after he

was appointed receiver as a matter of convenience, rather than opening his own escrow account. Kilgore then received numerous payments from Livingston's widow at her suggestion, to be nominated "tax-free gifts." When the widow said she was not going to pay him any more money, Kilgore took $67,800 from an account in the widow's name, using the widow's power of attorney without her permission.

Contrary to Kilgore's contentions, Livingston's agreements did not evaporate when he died, as if they had never existed. While the contingency of a recovery had not yet occurred, and the estate thus could not have sued the clients under the fee contracts, the estate would have been entitled to recover fees from the clients under the theory of quantum meruit for Livingston's portion of the fee. See *Greer, Klosik & Daugherty v. Yetman*, 269 Ga. 271, 274 (2) (496 SE2d 693) (1998). That is why the successor attorneys Kilgore consulted about taking over the litigation aspect of the cases questioned whether the estate would waive its claim to Livingston's fees if they undertook to represent Marquez and Borg. But the clients did not hire new counsel; Kilgore continued to represent them, and represented both his and the estate's interests obtaining attorney fees from Mikart. The Mikart class action settlement agreement specified that the company would pay the fees to Livingston's estate, and the question thus became not what the clients owed to Livingston but what Livingston's estate owed to Kilgore. As to the $204,006 attorney fees from Marquez's suit, Kilgore calculated that amount based on Livingston's fee contract with Marquez, which allowed for an hourly rate plus 15 percent. Kilgore's contract with Marquez included no provision for a percentage of the recovery, so obviously Kilgore's actions showed he did not think that contract had evaporated.

Most of the case law on an attorney's disputed right to fees involves attorney-client relationships rather than attorney-attorney relationships. In this case, neither the estate nor Kilgore seeks any additional fees from the clients, and the clients are satisfied with the amount of attorney fees awarded or deducted. Borg testified that he thought that the division of the $300,000 fees from the class action was between Kilgore and Livingston's estate, and he did not feel it was any of his business.

While it may be true, as Kilgore asserts, that he was the mastermind behind the litigation, in the absence of a fee agreement with Livingston he cannot divide the fees in a way he thinks they would have agreed to if Livingston had lived. As stated earlier, "lawyers jointly undertaking to represent a client without a contract as to the division of fees share equally." (Citation and punctuation

omitted.) *Nickerson v. Holloway*, supra, 220 Ga. App. at 553. Therefore the trial court did not err in granting summary judgment to Sheetz and ordering the estate to pay Kilgore $31,367.03.

### Case No. A04A1718

2. Within 45 days of the final order, Kilgore filed a motion for attorney fees pursuant to OCGA § 9-15-14. The trial court denied the motion, and Kilgore filed an application for discretionary appeal. Because the main case was before us on direct appeal, we granted the application pursuant to OCGA § 5-6-35 (j). On appeal, Kilgore enumerates six errors, all asserting the trial court abused its discretion by denying his motion and four of which relate to specific defenses raised by the estate. Considering the entire record, we conclude that the trial court did not err in denying the motion.

OCGA § 9-15-14 (a) provides for a mandatory award of attorney fees and expenses if a party asserts a claim or defense as to which "there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim." We review a trial court's ruling on an OCGA § 9-15-14 (a) motion for attorney fees under the "any evidence" standard; if any evidence exists to support the trial court's denial of the motion, it must be affirmed. *Bircoll v. Rosenthal*, 267 Ga. App. 431 (600 SE2d 388) (2004). OCGA § 9-15-14 (b) provides for a discretionary award of fees and expenses if the court "finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification or that the action, or any part thereof, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceeding by other improper conduct. . . ." We review rulings under this section for abuse of discretion. *Bankhead v. Moss*, 210 Ga. App. 508, 509 (1) (436 SE2d 723) (1993).

Considering each of Kilgore's claims but without writing an exhaustive, point by point analysis of them, we find that the trial court did not abuse its discretion and that evidence supports its denial of the motion. *Bankhead v. Moss*, supra, 210 Ga. App. at 510. We note that the estate substantially prevailed in its defenses and it would be difficult to conclude, therefore, that these defenses lacked substantial justification. Consequently, we find no error.

*Judgments affirmed. Ruffin, P. J., and Mikell, J., concur. Blackburn, P. J., not participating.*

DECIDED JULY 8, 2004 —
RECONSIDERATION DENIED JULY 28, 2004 — 

*Carl V. Kirsch, Michael A. Kilgore,* for appellants.
*McCalla, Raymer, Padrick, Cobb, Nichols & Clark, Monica K. Gilroy, Peter L. Lublin,* for appellee.